Michelle R Burrows 861606
MICHELLE R. BURROWS PC
16869 SW 65th Ave. # 367
Lake Oswego, OR 97035
503-241-1955
Michelle.r.burrows@gmail.com
www.oregoncivilrights.com

                    Attorney for Plaintiffs


                IN THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF OREGON

                        Portland Division


| | |
|---|---|
| ROBBIE J DAVIS, personal representative for the ESTATE of DONTE LAMAR DAVIS JR; and ROBBIE J DAVIS, in her individual capacity,<br><br>                    Plaintiffs,<br><br>v.<br><br>CITY OF PORTLAND, a municipal corporation; JOHN DOE POLICE OFFICERS 1-10; MULTNOMAH COUNTY; ROSEMARY OWENS; and DCJ JOHN DOES 1-4,<br><br>                    Defendants. | Case No.:<br><br>**COMPLAINT**<br>14th Amendment Denial of Life, Familial Loss, Intentional Infliction of Emotional Distress, Negligent Supervision<br><br><br>JURY TRIAL DEMANDED |


## INTRODUCTION

This matter arises from the shooting of Donté Lamar Davis Jr. ("Mr. Davis" or

"Decedent") on November 1, 2022 around 11:20 pm. Portland Police treated Mr. Davis as if he

were deceased but he was in fact still alive. Portland Police significantly delayed administering

1 – COMPLAINT

life-saving care to Mr. Davis who was pronounced dead on November 3, 2022 at 5:25pm at Oregon Health & Science University. Mr. Davis was under the supervision of Multnomah County Adult and Juvenile Services probation services who failed to supervise Mr. Davis and allowed his behavior to escalate and deteriorate.

## PARTIES

1.      Plaintiff Estate of Donté Lamar Davis Jr. ("Plaintiff Estate") is represented by Robbie J. Davis, the mother of Mr. Davis. The Estate is located in Multnomah County, Oregon.

2.      Plaintiff Robbie J. Davis ("Plaintiff") is the mother of decedent Donté Lamar Davis Jr. and brings this action on her own behalf as well as representing the Estate.

3.      Multnomah County is a political subdivision of the State of Oregon. Multnomah County manages and provides adult and juvenile parole and probation services. Mr. Davis was assigned to be supervised by Multnomah County Department of Community Justice (DCJ) Juvenile Services Division. He was assigned a supervisory counselor. Multnomah County has refused to provide any information regarding Mr. Davis or provide his file to his mother. The identity of Multnomah County employees responsible for Mr. Davis's supervision are unknown at this time.

4.      Multnomah County John/Jane Does 1-4 are employed by Multnomah County as either juvenile counselors, probation officers or supervisors of the same. Defendant Rosemary Owens was Mr. Davis's juvenile court counselor responsible for his care and supervision between March 2020 and November 2022. John/Jane Does has the assigned responsibility to manage, supervise and manage Mr. Davis between 2021 and 2023.

5.      The City of Portland is a municipal corporation within the State of Oregon. It employs John Doe Officers 1-10.

2 – COMPLAINT

6.      John Doe Police Officers 1-10 are police officers employed by the City of Portland by and through the Portland Police Bureau. Each of the John Doe Officers responded to the shooting of Mr. Davis and were involved in either the investigation of the shooting, investigation of the suspects or managed the shooting crime scene. Each of the John Doe Police Officers had a role in declaring Mr. Davis deceased and refusing to seek emergency medical care leading to the death of Mr. Davis. Plaintiff does not know the names of the John Doe Police Officers as the City has refused to disclose any and all information on the shooting or the investigation during the two years since the shooting. Plaintiff will seek discovery to learn the identity of the officers and amend the complaint accordingly. The John Doe Police Officers are sued in their individual capacity. They were all acting under color of law at the time of the alleged events.

7.      This action arises under ORS 30.020 (Wrongful Death) and the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Plaintiff is entitled to her attorney fees pursuant to 42 U.S.C. § 1988.

8.      Venue is proper in the District of Oregon pursuant to 28 U.S.C.§ 1391(b)(1) and (b)(2). Multnomah County is located in the District of Oregon, and the events, acts, and omissions giving rise to the claims in this action occurred in this district.

9.      A Tort Claim Notice was sent to Multnomah County on April 17, 2023 and receipt was acknowledged. A Tort Claim Notice was sent to the City of Portland within one year of Plaintiff learning that the Portland Police Bureau refused medical care to Mr. Davis.

## FACTUAL BACKGROUND

*A. Background of Shooting and Death of Donté Davis*

10.    On November 1, 2022, Donté Davis, a Black youth resident of Portland, Oregon, was shot by an unidentified person(s) and suffered life-threatening injuries. Mr. Davis was 19 years old when he was shot.

11.    Upon information and belief, on or about November 1, 2022, several people made 911 calls reporting both major and minor disturbances, and hearing gunfire. Witnesses reported that someone appeared to have been shot, was left lying in the street/sidewalk and needed emergency medical assistance. It is believed Mr. Davis was shot by another party inside the vehicle in which he was riding who tossed Davis to the street and drove away. It is believed Portland Police know the exact identity of the suspected shooter.

12.    Upon arrival by John Doe Police officers Mr. Davis was refused any medical intervention by law enforcement. John Doe Police officers pronounced Davis deceased even though he was still alive; and did not call for medical care for between thirty and forty-five minutes. Mr. Davis is black. The delay by John Doe Police Officers in calling for medical care lost critical time needed for hospital staff to render proper care and to stabilize decedent reducing decedent's chances of life and survival.

13.    Witnesses reported several uniformed John Doe Police defendants standing around Mr. Davis without rendering any care or even securing him from the view of bystanders.

14.    Upon information and belief, Mr. Davis was left on the street in frigid temperatures by Portland Police (approximately 41 degrees) and wet conditions for more than thirty (30) minutes while awaiting arrival of American Medical Response ("AMR") to transport him to a nearby emergency hospital. AMR transported Mr. Davis to Legacy Emmanuel hospital

rather than OHSU, a Trauma 1 hospital, where he received medical interventions. Legacy was not able to provide the advanced trauma care needed and Mr. Davis was transported by vehicle to OHSU.

15.    From November 2, 2022 to November 3, 2022, Mr. Davis remained on life support. On November 3, 2022, Mr. Davis passed away. Donté Davis was 19 years old.

*B. Background of Failures by Multnomah County to Supervise and Protect Donté Davis*

16.    On or around November 1, 2020, Mr. Davis was arrested and placed in the Multnomah County Department of Community Justice (DCJ) Juvenile Services Division supervision for possession of a firearm. Mr. Davis was 17 years old.

17.    On January 8, 2021, a hearing at the Multnomah County Circuit Court was held to consider temporary custody of Mr. Davis for probable cause of unlawful possession of a firearm. The court ordered that Mr. Davis be released to Plaintiff with the following conditions: community monitoring, regular school attendance, keep all appointments with [court] counselor, 9 PM curfew, no possession of firearms, no riding in cars with guns present (except with Mother), no leaving the house without Plaintiff's permission, and no possession of illegal substances or alcohol.

18.    On or around March 30, 2021, Mr. Davis admitted to possession of a firearm in Multnomah County Circuit Court. The court accepted Mr. Davis's admission, subsequently ordered Mr. Davis to complete supervision under Multnomah County Juvenile Justice Division, postponed adjudication and disposition of the court case, and granted conditional postponement until March 29, 2022.

19.    On March 30, 2021, Multnomah County Circuit Court placed Mr. Davis on conditional postponement and release under the supervision of Multnomah County ordering Mr. Davis to follow all court orders including:

    a.  Attend school on all scheduled days;

    b.  Sign a release of information so that JCC can speak to the school;

    c.  Not own or possess fake or real weapons;

    d.  Not have or use alcohol or illegal drugs;

    e.  Complete a substance abuse evaluation by April 30, 2021;

    f.  Go to treatment recommended by evaluator;

    g.  Give a drug/alcohol test if JCC or treatment provider asks for one;

    h.  Not leave the state of Oregon without permission of JCC before leaving;

    i.  Obtain permission from the adult in charge to leave home/placement;

    j.  Tell JCC of home address, phone number changes, school or work changes;

    k.  Attend appointments when told to by JCC and follow their directions;

    l.  Consent to search of your person, residence, vehicle, and personal property (including electronic devices such as computers and cell phones) if JCC has reasonable suspicion to believe that evidence of a violation of your conditional postponement requirements will be found;

    m.  Successfully complete a mental health evaluation and enter and successfully complete a mental health treatment program if recommended by the evaluation and as directed by JCC;

    n.  Sign releases of information as requested by JCC;

    o.  Obey the directions of the Juvenile Court Counselor (JCC);

p.  Keep all appointments and participate in individual and/or group skill building activities as directed by the JCC - specifically cooperate with a referral to the Community Healing Initiative program; and

q.  Write a book report on the book: <u>Just Mercy</u>.

20.    Multnomah County DCJ juvenile court counselors ("JCC") are "trained and required to complete assessments and case planning with youth and families, provide accountability and services to youth in the community, and respond quickly to supervision violations."

21.    JCCs "provide background that helps the judge make decisions about next steps that are in the best interest of a youth if a youth faces legal proceedings. If a youth is placed on community supervision (probation), JCCs and family meet on a regular basis to assure positive changes."

22.    The conditions of Mr. Davis's release were assigned to Multnomah County employee JCC Candace Johnson of Multnomah County DCJ. At all relevant times, Candace Johnson was a Multnomah County employee.

23.    On or around January 6, 2021, during an intake report, Defendant Multnomah JCC Candace Johnson expressed that Mr. Davis "made a mistake by taking possession of a handgun: however, it does not have to be one that affects his life for a long period. He is in control about how he chooses to play out the rest of his life. Donté Davis has every opportunity to be successful and this JCC believes that he will be successful."

24.    JCC Candace Johnson stated in the January 6, 2021 intake report that Mr. Davis struggled with maintaining his mental health. The report documented both mental and significant learning disabilities.

25.     JCC Candace Johnson noted in the January 6, 2021 intake report that Mr. Davis's mother had reported him as a runaway four (4) times, with the most recent report filed in October 2020.

26.     On or around April 28, 2021, Mr. Davis was reassigned to Multnomah County employee JCC Rosemary Owens of Multnomah County DCJ Juvenile Division for supervision. Mr. Davis had his first appointment with (then) newly reassigned JCC Owens.

27.     On May 6, 2021, Mrs. Davis reported that Mr. Davis was not following the court's orders and was no longer living with his mother.

28.     On May 12, 2021, Plaintiff reported to JCC Owens that she was still out of contact with her son, Donté Davis. Plaintiff explained to JCC Owens that she was worried about Mr. Davis's whereabouts and safety due to past reported and documented behaviors. Plaintiff stressed that she feared that her son would either regress/worsen, end up deeper in the justice system or worse, be shot/killed. Plaintiff expressed to the JCC that it was important to follow the court orders in order to avoid harm to Mr. Davis.

29.     On May 12, 2021, Plaintiff requested that Mr. Davis receive a probation violation for lack of following the court orders and that Mr. Davis be placed on electronic monitoring and ordered back home.

30.     On or around June 3, 2021, Plaintiff alerted JCC that Mr. Davis was staying with his underage girlfriend and mother - in an unfit and inappropriate environment. Plaintiff provided JCC with contact information and an address for Mr. Davis's location (girlfriend's house).

31.     On or around June 3, 2021, Plaintiff confronted JCC Owens about JCC Owens's inadequate supervision and failure to hold Mr. Davis accountable to Multnomah County Circuit Court's orders.

32.     On or around June 3, 2021, Plaintiff requested Mr. Davis's full juvenile file. JCC Owens questioned Plaintiff's need to receive it and denied Plaintiff's request. JCC Owens and Plaintiff had a heated discussion about Plaintiff's access to Mr. Davis's juvenile file.

33.     On or around June 3, 2021, and upon information and belief, feeling challenged by Plaintiff, JCC Owens responded by threatening to request a court hearing and requesting that Mr. Davis be placed in foster care. JCC Owens then scheduled a court hearing.

34.     On or around June 9, 2021, Multnomah County Circuit Court ordered that Mr. Davis be temporarily placed in the care of Multnomah County DCJ and temporarily live in foster care placements within Boys and Girls Aid ("BGAid") and Maple Star Oregon program as requested by JCC Rosemary Owens's request.

35.     Upon information and belief, Maple Star Oregon is a private non-profit agency that provides social services to children and families throughout the State of Oregon. Upon information and belief, Maple Star was unable to accept Mr. Davis's foster placement. Instead, Mr. Davis was temporarily placed with BGAid.

36.     On or around August 2, 2021, Mr. Davis and another individual were arrested in Washington County for, upon information and belief, allegedly breaking a convenience store door and taking cigarettes, which were charged as burglary offenses.

37.     On or around August 2, 2021, Mr. Davis was released from a Washington County hold and placed in Multnomah County Adult Division supervision for an alleged criminal offense committed when he was under Multnomah County DCJ Juvenile Division's supervision and foster placement. Donté Davis was 18 years old when was placed in Multnomah County DCJ Adult Division supervision.

38.     On or around August 9, 2021, Mr. Davis was placed in Maple Star Oregon's care and was required to live with foster parent Ms. Rosemary Chitala.

39.     On or around mid-September, 2021, Mr. Davis communicated to his school that foster parent Ms. Chitala only allowed him to eat innutritious meals and that Ms. Chitala's daughter was mistreating him.

40.     On or around September 19, 2021, Plaintiff complained to Ms. Chitala that Mr. Davis reported that Ms. Chitala was feeding him innutritious meals and that Mr. Davis reported mistreatment by Ms. Chitala and her adult daughter. Following Mr. Davis's and Plaintiff's complaints, Ms. Chitala immediately terminated Donté Davis's foster care placement.

41.     On or around September 24, 2021, Mr. Davis reported his complaint to JCC Owens about being fed innutritious meals by Ms. Chitala. Plaintiff complained to JCC Owens about Ms. Chitala failing to ensure Mr. Davis was properly groomed. Ms. Chitala, who was present when those complaints were made, was visibly upset by Mr. Davis's and Plaintiff's reporting concerns about Ms. Chitala's care of Mr. Davis. JCC Owens informed Mr. Davis and Plaintiff that she was presenting Mr. Davis's case to Multnomah County DCJ's Alternative Placement Committee to have him placed in Oregon Youth Authority's care despite Mr. Davis's request to go back home.

42.     On or around September 28, 2021, JCC Owens presented Donté Davis's case to the Alternative Placement Committee despite Mr. Davis showing growth, demonstrating that he could be responsible, and requesting to be placed with his mother/Plaintiff. At the meeting, which included JCC Owens, Ms. Chitala informed the committee that she was terminating Mr. Davis's placement with her. During the meeting, Ms. Chitala expressed a concern for Mr. Davis's safety as she disclosed that Mr. Davis feared for his safety, ran to and from his school

building and Ms. Chitala's vehicle because he feared for his safety, and that meetings with his

dad were volatile.

43.     On or around September 29, 2021, the Alternative Placement Committee rejected

JCC Owens's request to place Mr. Davis in Oregon Youth Authority's care. A representative of

the Alternative Placement Committee stated that placement with Oregon Youth Authority was an

extreme measure and it was unclear why JCC Owens requested such extreme measures.

44.     On September 29, 2021, Multnomah County Circuit Court revoked Mr. Davis's

conditional postponement and ordered that Mr. Davis serve eighteen (18) months on probation.

On September 29, 2021, Plaintiff requested that the Multnomah County Circuit Court order

Donté Davis to remain in her care, follow her rules around curfew, have a mental health

assessment completed, attend drug and alcohol treatment, and attend school daily. Multnomah

County Circuit Court granted Plaintiff's request and ordered that Mr. Davis follow Plaintiff's

rules around curfew, have a mental health assessment completed, attend drug and alcohol

treatment, and attend school daily.

45.     On or around December 2021, Plaintiff reported to JCC Owens that Mr. Davis

was not following court orders and left her home. Plaintiff requested that JCC Owens require Mr.

Davis to follow court orders, including returning to Plaintiff's home.

46.     On February 2, 2022, Plaintiff reminded JCC Owens that Mr. Davis was violating

court orders and was not living with Plaintiff. Plaintiff inquired about Mr. Davis's drug and

alcohol treatment plan and Plaintiff requested a meeting with JCC Owens, Mr. Davis, and the

Multnomah County DCJ Juvenile Division's team. JCC Owens didn't schedule the meeting.

47.     On February 8, 2022, Plaintiff reported to JCC Owens that Mr. Davis continued to

violate court orders by continuing to live away from her home, that Mr. Davis was living with

his underage girlfriend and the girlfriend's mother without Plaintiff's consent, and Mr. Davis

was not attending school. Plaintiff pleaded with JCC Owens to schedule a court hearing and to

request from Mr. Davis and then provide to Plaintiff the address for Mr. Davis's girlfriend's

home where he was residing.

48.    On February 11, 2022, JCC Owens confirmed that Mr. Davis was living with his

teenage girlfriend and her mother and she said Mr. Davis provided to JCC Owens the girlfriend's

address.

49.    On February 25, 2022, JCC Owens reported that she met with Mr. Davis's

girlfriend and her mother. Upon information and belief, JCC Owens did not visit Mr. Davis's

girlfriend's home to ensure the living environment was safe or conducive to Mr. Davis's

development.

50.    On or around February 25, 2022, JCC Owens approved Mr. Davis to live with his

underaged girlfriend and the girlfriend's mother. Living with his girlfriend was a violation of the

court orders.

51.    On or around March 13, 2022, Mr. Davis's adult probation officer of Multnomah

County DCJ Adult Division, Ms. Marilu Semph, attempted to complete a home visit at Plaintiff's

house because Mr. Davis had not complied with the adult probation conditions.

52.    On or around March 14, 2022, the Plaintiff alerted Ms. Semph that JCC Owens

gave authorization for Mr. Davis to live with his girlfriend and girlfriend's mother. Ms. Semph

was shocked that JCC Owens permitted the change in residence. Ms. Semph shared with Plaintiff

that JCC Owens "knew better" than to allow the transition to anywhere outside of the Plaintiff's

home, as new placements needed to be approved by adult probation officer, Ms. Semph.

53.     On or around March 17, 2022, JCC Owens told Plaintiff that Mr. Davis was no longer living with his girlfriend and that she did not know where he was living.

54.     On March 17, 2022, Plaintiff reported concerns to Multnomah County DCJ Juvenile Division employees, Belinda Pascual and Deena Corso, about JCC Owens's inadequate and detrimental oversight of Mr. Davis's progress and her retaliatory conduct against Plaintiff and Mr. Davis. Plaintiff requested a court hearing and that JCC Owens not be assigned as Mr. Davis's JCC.

55.     Despite Plaintiff's request for the Multnomah County DCJ Juvenile Division to reassign JCC Owens as Mr. Davis's JCC, she remained his JCC.

56.     On or around March 17, 2022, Mr. Davis entered warrant status for failure to appear in court due to a probation violation issued by Ms. Semph for missed meetings and failure to alert Ms. Semph about his whereabouts.

57.     On March 17, 2022, JCC Owens stopped communicating with Plaintiff and upon information and belief, JCC Owens stopped communicating with Mr. Davis. Upon information and belief, JCC Owens ceased providing necessary services to Mr. Davis on or around March 17, 2022. During this period, no efforts were made by Multnomah County DCJ Juvenile Division to ameliorate Mr. Davis's behavior.

58.     On March 27, 2022, Plaintiff stated to Multnomah County DCJ Juvenile Division Community Justice employee Manager, Karl Johnson and JCC Owens that Mr. Davis was not developmentally mature to make sane and healthy decisions. Plaintiff also complained that JCC Owens did not have Mr. Davis's best interests regarding his growth, development, and safety.

59.     On or around July 26, 2022, Plaintiff convinced Mr. Davis to turn himself into Multnomah County Detention Center in order to resolve his warrant status.

60.     On or around July 27, 2022, Mr. Davis and his father went to Multnomah County Detention Center to turn himself in; however, Multnomah County turned Mr. Davis away due to not having proper identification.

61.     On or around July 27, 2022, Plaintiff communicated with Mr. Davis's newly assigned Multnomah County probation officer and let him know that Mr. Davis tried to turn himself in but the Multnomah County employee working at the detention center refused to accept him due to unacceptable identification.

62.     On multiple occasions during Multnomah County's supervision of Mr. Davis, Plaintiff alerted Defendant Multnomah County DCJ that Mr. Davis was not in compliance with community supervision. Plaintiff informed Defendant Multnomah County DCJ that Mr. Davis was mentally unstable and neurodivergent, that she was concerned for Mr. Davis's safety, and that Mr. Davis should be held accountable.

63.     Upon information and belief, due to unfair treatment, retaliatory actions and hostile interactions with JCC Owens, Plaintiff requested in writing that JCC Owens be removed from her son's case on March 17, 2022, March 22, 2022, and March 27, 2022. Despite multiple alerts, pleas for assistance, and complaints, Multnomah County DCJ did not complete assessments and case plan with Mr. Davis *and* his family, provide accountability and services to Mr. Davis in the community, respond quickly to supervision violations, or provide accurate background to help the judge make decisions about next steps that were in the best interest of Mr. Davis if he faced legal proceedings.

64.     Because of this, Mr. Davis was allowed to engage in detrimental behaviors resulting in him being shot and ultimately dying.

65.     Between March 30, 2021 and until November 4, 2022, Mr. Davis was supervised by Multnomah County. At all material times, Mr. Davis was under Multnomah County DCJ's supervision. Mr. Davis was on probation supervised by Defendant Multnomah County on the day that he was shot and until the day he died.

*C. Background of Involvement of Portland Police Bureau*

66.     On or about November 1, 2022, Decedent was shot by an unidentified person. Mr. Davis was a passenger in a car with at least three other individuals, one of whom apparently shot Mr. Davis. Upon information and belief, Plaintiff alleges Portland Police have investigated the shooting for two years, have likely identified the shooter, and refuse to release any information on the shooting or Mr. Davis's death claiming it is an "ongoing investigation".

67.     Unidentified person(s) involved in Mr. Davis's murder remains at large.

68.     On or about November 1, 2022, witnesses saw suspects remove Mr. Davis from a vehicle and leave him outside as the suspects in two separate vehicles retreated from the scene.

69.     On or about November 1, 2022, City of Portland's employees and active-duty law enforcement officers and detectives arrived at the scene where Mr. Davis had been left. They secured the crime scene and pronounced Mr. Davis dead at the scene. It is unknown whether any responding PPB officer is trained medically to determine death nor does the law allow them to make such pronouncement.

70.     Upon information and belief, witnesses report responding officers standing around Decedent's body for about 30 minutes, rather than rendering medical care and/or directing emergency services to implement life saving measures immediately.

71.     Upon belief, City of Portland law enforcement broke protocol and mispronounced Decedent deceased to witnesses. Upon information and belief, City of Portland law enforcement did not immediately enact a thorough investigation/search of the crime scene.

72.     Witness(es) report law enforcement, detectives and other professionals at the crime scene left Decedent's body uncovered, acting inhumanly with no regard to Decedent's life, leaving Decedent's body to further decline while in frigid temperatures (41 degrees) and wet/rainy weather.

73.     Mr. Davis was denied any chance of survival, due to law enforcement's decisions to not render care and life-saving measures immediately nor to call for medical care immediately.

74.     Upon information and belief, AMR arrived and declared Decedent alive, as Decedent still had a pulse. It is unknown whether law enforcement checked for a pulse or other indicators of life prior to declaring Mr. Davis dead. Law enforcement stepped out of professional capacity by making the decision to declare Decedent deceased when in fact, he was still alive with an active pulse; emergency officials/law enforcement significantly contributed and/or became the cause of Mr. Davis's death.

75.     AMR drove Decedent to Legacy Emanuel Hospital. Legacy Emanuel Hospital was not equipped to complete vital treatment, procedures, or surgery. AMR neglected to air transport Decedent to Oregon Health & Science University, which is a Trauma 1 emergency hospital. Instead, he was driven to OHSU, further delaying opportunities to implement life-saving measures.

76.     Plaintiff has been responsive, cooperative and has provided sufficient tips and leads to law enforcement to support with successfully solving the Decedent's murder case within

a timely manner; it has been approximately 730 days (2 years) since Decedent's death. Plaintiff

believes detectives have enough evidence: DNA, witness statements, identifiable information of

suspects and primary residence(s), have/had possession of one of the vehicles (presumably the

vehicle in which Decedent was driving and 3-4 other youth/men occupied at the time of death),

medical examiner reports, security device recordings, and other information to solve the

Decedent's case.

77.    Plaintiff requested the following records: medical examiner's report, police

reports, and emergency call recordings. All requests were denied due to a pending/active

investigation. Plaintiff believes City of Portland employees/officials strategically withheld

records and delayed to solve and/or apprehend the individuals involved in the shooting(s).

Without a solved case, Plaintiff is unable to retrieve pertinent information (without the court's

orders), thus making it nearly impossible to learn about COP's misconduct as it pertains to the

investigation and loss of life of Plaintiff's son, Donté Lamar Davis Jr.

78.    Upon belief, PPB intentionally withheld information to cover up grossly negligent

behavior to avoid Plaintiff learning about law enforcement's misconduct. Upon information and

belief, PPB has sufficient evidence of youth involved in decedent's murder; PPB is responsible

for allowing suspects to remain in the community without consequence and afforded the ability

to continue to cause harm to others in the community.

79.    Plaintiff alleges law enforcement were alerted about shooting rampage/events,

and did not respond until it was too late and Decedent was injured. On or about November 3,

2023, Plaintiff provided City of Portland with timely notice of Mr. Davis's and Plaintiff's

wrongful death, negligence, and retaliations claims against City of Portland as required by ORS

30.275.

17 – COMPLAINT

80.     Upon belief, Plaintiff believes that due to lack of information provided about the events on the night Decedent was shot, and PPB's refusal to provide important and necessary reports, Plaintiff would have had no way of learning about PPB's negligent, reckless, and intentional misconduct, their racially- and socially-motivated and biased behaviors, and refusal to render care.

81.     Plaintiff learned about PPB's, Multnomah County's, and Emergency Services' (law enforcement, AMR and/or fire department) negligent, reckless, and intentional conduct, racially- and socially-motivated and biased behaviors, and refusal to render care on November 2, 2023. Although statutes state Tort Claim Notices are to be served to public entities within one (1) year, due to Defendants Portland and Multnomah County withholding reports pertaining to claims, Plaintiff did not learn about the wrongful behaviors until November 2, 2023. Plaintiff filed a Tort Claim Notice on November 3, 2023, the soonest possible with the limited information Plaintiff had.

82.     Upon information and belief, the Woodlawn Neighborhood has a known history of gun and gang violence/activity. PPB has neglected their duties to the residents of that area by allowing unlawful activity to continue without successful interventions in place.

83.     Portland Police Bureau has a known history of carrying out racist and culturally-insensitive behaviors within the Black community. Plaintiff alleges that PPB Defendants believed that because Mr. Davis was Black, he was a "gang member" and not worthy of medical intervention. Plaintiff alleges that if Mr. Davis had been Caucasian he would have been transported to the hospital immediately, thus enhancing the chances of survival.

84.     In 2022, Portland experienced one of their deadliest years with 101 homicide victims. Of the 101 homicide victims, 47 were identified as Black and 41 as Caucasian. Black

people make up only 6% of Portland's population and a disproportionate number of homicide victims.

**FIRST CLAIM FOR RELIEF:** Substantive Due Process 14th Amendment
Failure to Protect Donté Davis Leading to his Death
Defendants JCC Owens and Multnomah County John Does

85.    Plaintiff realleges all previous paragraphs as if more fully set forth herein.

86.    Mr. Davis had Constitutionally-protected "fundamental rights" including his life and liberty pursuant to the substantive due process clause of 14th Amendment to the United States Constitution. Defendants can be held liable for their actions and inactions which cause a deprivation of life or liberty. Defendants Owens and Multnomah County John Does were deliberately indifferent to the rights held by Mr. Davis and their conduct may even shock the conscience given the significant opportunities to do the right thing coupled with the refusal to do so.

87.    Mr. Davis was mandated to the care and supervision of Multnomah County as a young offender. Multnomah County stood in a parental role over Mr. Davis including managing where he lived and with whom he could associate. They were tasked by law with protecting Mr. Davis from his own behaviors and to keep him safe. Multnomah County John Does and JCC Owens had a duty by law to act in Mr. Davis's best interests and to stop behaviors and actions which could cause Mr. Davis harm, including his own death.

88.    Multnomah County John Does and JCC Owens had an absolute duty under law and the Constitution to prevent delinquent behavior, dangerous or self-harming conduct by Mr. Davis. Furthermore, Mr. Davis was neurodivergent and had difficulty with decision-making and managing his own behaviors. He was more vulnerable than most. Mr. Davis's status was known

to Defendants JCC Owens and Multnomah County John Does and they were in a special relationship with Mr. Davis conferring a higher duty of care.

89.     Plaintiff provided regular and frequent information to JCC Owens and Multnomah County John Does on Mr. Davis's behaviors, dangerous actions, and inappropriate associations with other individuals. She requested a tighter form of supervision and repeatedly requested more sanctions imposed on her son to provide him with safety and security. These requests and information were ignored by Owen and Multnomah County John Does.

90.     Rather than move to provide more protections and security for Mr. Davis, JCC Owens and her supervisors retaliated against Plaintiff by refusing to speak with her and convinced her vulnerable son to withhold critical information including his living situation and his criminal behaviors. This conduct removed one level of supervision on Mr. Davis and made him much more susceptible to coercion, manipulation and harm by others.

91.     JCC Owens and Multnomah County John Does knew Mr. Davis was engaged in high-risk associations and behaviors which led him to commit additional dangerous crimes and possess weapons. The individuals who shot and left Mr. Davis were some of the associates in which he was committing crimes and violations with prior to his death. JCC Owens either knew this or should have known it based on the volume of information provided by Plaintiff. JCC Owens ignored Mr. Davis to his death.

92.     The individual defendants and Multnomah County had a duty to protect Mr. Davis's life and his liberty interests from known and threatened harm. They had an absolute duty to act to protect Mr. Davis and their failure to do so directly led to the shooting which killed Mr. Davis.

93.     As a result of the continual failure to perform their Constitutional duties and protect Mr. Davis, he was inevitably placed in a dangerous situation which directly caused his death.

Multnomah County John Does and JCC Owens knew of Mr. Davis's behaviors and refused and failed to take action to protect him thus resulting in his death. The failure to protect Mr. Davis was the cause of his death.

94.     As a result of the failures by Multnomah County John Does and JCC Owens, Plaintiff Estate suffered economic and non-economic losses to be more fully developed at trial.

**SECOND CLAIM FOR RELIEF:** Substantive Due Process 14th Amendment
Interference with Familial Relationships
Defendant JCC Owens

95.     Plaintiff realleges all previous allegations as if more fully set forth.

96.     Plaintiff was Mr. Davis's mother. She enjoyed a close and loving familial relationship with her son. Her relationship and its enjoyment with her son is protected by the 14th Amendment Due Process clause from serious interference by government actors.

97.     The conduct by Multnomah County John Does and JCC Owens was a serious interference with her close relationship with her son. Defendants knew Plaintiff was involved in her son's care and life, as she made numerous requests for intervention from Defendants to protect her son and warned of his dangerous associations and behaviors. At no time did Defendants choose to assist or intervene in Mr. Davis's behavior and over two years watched him slip into increasingly dangerous behavior. Defendants further interfered with the relationship by cutting off communications with Plaintiff and alienating her vulnerable son from her such that there were times no one knew where he was for weeks at a time.

98.     Based on the foregoing, Defendants' conduct in failing so miserably to manage and supervise and protect Mr. Davis resulted in Plaintiff losing contact with her son before his death, suffering a severe interference with that relationship, and, ultimately losing her son entirely to the deliberately indifferent behavior by Multnomah County John Does and JCC

Owens. Plaintiff suffered irreparable emotional loss, slipped into serious depression, and has not

been able to work since her son's murder. This situation is further enhanced for Plaintiff by

Multnomah County's refusal to provide any information, records, or communications on her son.

99.     Based on the failures and inactions by Multnomah County John Does and JCC

Owens, Plaintiff has suffered loss of income, medical expenses, and severe emotional damages

of pain, loss of society with her son and the continuation of that relationship into his future.

Plaintiff will be seeking her economic and non-economic damages at trial in an amount to be

determined at that time.

**THIRD CLAIM FOR RELIEF:** 14th Amendment Loss of Life and Liberty
Portland Police Officer John Does

100.     Plaintiff realleges all previous paragraphs as if more fully set forth herein.

101.     Mr. Davis held Constitutionally protected "fundamental rights" including his life

and liberty pursuant to the substantive due process clause of 14th Amendment to the United

States Constitution. Defendants can be held liable for their actions and inactions which cause a

deprivation of life or liberty. Defendants Portland Police Officers were deliberately indifferent to

the rights held by Mr. Davis and may even shock the conscience given the significant

opportunity to do the right thing coupled with the refusal to do so.

102.     Once the Portland Police Officer John Does took over control of the crime scene

and Mr. Davis, they assumed a duty to behave in compliance with the law and the Constitution.

They also were mandated to comply with their own policies and procedures. They failed to

adhere to even the most minimal behaviors set out by law. Law Enforcement has a duty to

protect those they respond to and to do so in a way not to cause further harm or deprivations. By

neglecting to adequately check Mr. Davis for even a pulse they violated Oregon law and the duty

to protect Mr. Davis's life.

103.    All police officers employed by Portland Police Bureau are bound by policies and procedures which are contained in the Portland Police Bureau Policies and Procedures Manual. The rules have changed since the shooting death of Mr. Davis, but the basic mandates remain the same. The applicable policy governing the conduct of the Portland Police John Doe Defendants include, without limitation:

a.  The mission of the PPB is to reduce crime and fear by working with all citizens to preserve life, maintain human rights . . . PPB 020.00.

b.  The Bureau's adopted Human Goals state: The PPB exists to protect and serve the community, must always be guided by the principle that the individual has infinite dignity and worth. In all that we do, we must show respect for the citizens we serve.

c.  If the officer observes any signs of life, medical shall be requested to the scene to provide medical attention or determine death. Medical personnel on scene will determine whether the patient will be transported. PPB 631.10.

d.  Preserving life is a fundamental duty for law enforcement. The Bureau and its members are committed to fulfilling that duty. PPB 630.50, DIR 640.45.

e.  Members shall provide emergency medical aid to ill or injured persons, to the extent that are currently trained, equipped and able. . .. after emergency medical services EMS have been requested. PPB 630.50 (1.1).

f.  Members shall continuously monitor the person for changes in skin or lip color, breathing, and levels of consciousness. PPB 630.50 (4.2).

g.  When ordering EMS, members may specifically request a Code 1 or Code 3 response. Code 3 should be used if the patient is unconscious, not breathing,

23 – COMPLAINT

in shock, experiencing chest pains and has a history of heart problems. PPB
630.40.

h.  Members will immediately call EMS if they have concerns or questions
regarding a subject's medical status. EMS will respond and evaluate/assess
the subject's medical condition. PPB 630.45. Once on scene EMS will have
the responsibility of determining the appropriate medical treatment.

i.  Furthermore, police are bound by state statute. Official Misconduct is
forbidden by law and is found where a public servant knowingly performs an
act constituting an unauthorized exercise in official duties. ORS 162.415.

j.  Police Supervisors may also be held liable under the Official Misconduct
statute if they are aware of and consciously disregard the fact that the
violation creates a risk of physical injury to a vulnerable person, or the
withholding from a vulnerable person of necessary and adequate food,
physical care or medical attention. ORS 162.415.

104.    Defendants can be held liable if their behavior and conduct shocks the conscience
which requires a showing of more than mere negligence but is created when injuries are
produced and the behavior of the defendants is deliberately indifferent to the rights held by the
Plaintiff. In this case many factors were at play including racial bias by the officers, association
by officers to gang activity, and refusing to even acknowledge the value of the life of a young
black man who was shot and dumped unceremoniously on the street. The behaviors of the
Defendant Police Officers were observed by numerous neighbors and witnesses who believed the
conduct and words used by the Portland officers was inhumane, callous, and obviously not
concerned with the life of Mr. Davis.

105.    In pronouncing Mr. Davis dead before medical personnel arrived and failing to call Code 3 for transport, Portland Police John Does eliminated any hope of viable medical treatment for Mr. Davis and the hope of life. Mr. Davis lay in the street seriously wounded in the cold rain while officers already determined he was dead and were causing enough delay to ensure that outcome. The behavior observed by neighbors of the conduct of the responding officers was callous in the true sense of the word with no regard to the wellbeing of Mr. Davis.

106.    The injuries sustained by Mr. Davis included brain edema, bleeding, and trauma damage which should have been assessed within the first hour, labeled the "golden hour" by neurosurgeons. Absent trained trauma and neurological examination, there was no way to ascertain exactly the extent of Mr. Davis's injuries. But the actions of Portland Police John Does took away even the chance of care and recovery, and allowed the bleeding to continue unabated and the brain to swell to dangerous levels.

107.    As a result of the conduct of the John Doe Police Officers, Mr. Davis was denied medical care and delayed transport to the hospital while suffering significant blood loss. Mr. Davis died because he was not provided timely care and was not transported within the standards set by the City of Portland. The delay by Portland John Doe Police officers and their refusal to correct their behaviors caused the ultimately death of Mr. Davis. It is the epitome of "shocking the conscience" when police officers conduct themselves in this fashion.

108.    As a result of the unconstitutional conduct by Portland Police John Does, Mr. Davis died on November 3, 2022 after suffering for three days. The Estate incurred financial losses and non-economic damages for Mr. Davis's lingering death and the indignities he endured on the street. Plaintiff will seek economic and non-economic damages at trial in an amount to be determined at that time.

**FOURTH CLAIM FOR RELIEF:** 14TH Amendment Familial Loss
Defendants John Doe Police Officers

109.    Plaintiff realleges all previous allegations as if more fully set forth.

110.    Plaintiff Robbie Davis is Mr. Davis's mother. She enjoyed a close and loving familial relationship with her son. Her relationship and its enjoyment with her son is protected by the 14th Amendment Due Process clause from serious interference by the government actors.

111.    The unconscionable behavior by Portland Police John Does caused the loss of Plaintiff's relationship with her son forever. Based on the failures and inactions by Portland Police John Does, Plaintiff has suffered loss of income, medical expenses and severe emotional damages of pain, loss of society with her son and the continuation of that relationship into his future. Plaintiff will be seeking her economic and non-economic damages at trial in an amount to be determined at that time.

112.    Plaintiff attempted repeatedly to obtain more information on the shooting and the nature of her son's death. She was contacted by Portland Police Bureau detectives by phone several times and by the Multnomah County District Attorney Victims' Right Advocate who offered to provide any assistance. Despite Plaintiff's repeated requests for more information, the PPB refused to provide any information claiming they were not permitted to divulge information because of the ongoing nature of the criminal investigation. The investigation is apparently still "ongoing" two years later.

113.    Plaintiff and her family held a vigil on the one-year anniversary of Mr. Davis death at the scene of the shooting. Neighbors who witnessed the vigil approached informing them of their observations from the night of the shooting and interactions with the Portland Police Bureau. On November 2, 2023, Plaintiff learned for the first time that her son was alive when located by the Portland Police Bureau who immediately pronounced him dead and failed to

provide any medical care or conduct the observations mandated by PPB Policy. The ambulance arrived after the police pronounced Mr. Davis dead. The intentional withholding of information by PPB was intentional.

## SUPPLEMENTAL JURISDICTION STATE CLAIMS
Multnomah County

**FIFTH CLAIM FOR RELIEF**: Negligent Supervision of Decedent: Special Relationship

114.    Plaintiff realleges all matters previously alleged herein.

115.    A special relationship between Multnomah County and Decedent such that Multnomah County owed the following duties:

    a.    To act in the best interests of Mr. Davis;

    b.    A duty to protect Mr. Davis from his own actions as well as those of third parties;

    c.    A duty to take charge of Decedent while he was committed to the juvenile justice system; and

    d.    A duty to prevent future delinquent behavior by Decedent through the use of early and certain sanctions and through rehabilitation and reformation programs.

116.    Defendant Multnomah County failed to abide by the legal mandates governing Mr. Davis's supervision and breached virtually all the duties they owed to him, including, without limitation:

    a.    By failing to decisively intervene in decedent's delinquent behaviors especially after receiving proof and confirmation of those behaviors. The behaviors noted by Plaintiff and various other counselors included new

crimes, missing school and treatment, moving to unknown locations, associating with known felons, and failing to report to officers.

b.  By failing to use or recommend early and certain sanction which would have prevented Mr. Davis from engaging in illegal and dangerous behavior.

c.  Mr. Davis was neurodivergent and manifested the inability to make safe decisions for himself. Defendants knew this and failed to provide a safety plan for him including treatment and supervised living situations.

d.  By failing to adequately monitor Mr. Davis.

e.  By failing to arrest and detain Mr. Davis when he violated the terms of his probation.

f.  By failing to enroll or manage Mr. Davis in reformation and rehabilitation and to ensure he remained in school and sought mental health treatment pursuant to court orders.

g.  By failing to enforce the terms and conditions of release ordered by the court upon Mr. Davis placement on supervision.

117.    Defendants' failure in their mandated state policies, court orders, and internal policies created an unnecessary foreseeable risk of serious harm to Mr. Davis. This breach of their duties was the direct and proximate cause of Mr. Davis's death.

118.    As a result of the breach of its duty and Mr. Davis's foreseeable death, the Estate incurred economic damages to include funeral expenses and medical expenses in a number which will be subsequently included. Mr. Davis suffered severe emotional harm including fear, confusion, and isolation all to his non-economic damage.

**SIXTH CLAIM FOR RELIEF**: Intentional Infliction of Emotional Distress
Multnomah County

119.    Plaintiff realleges all previous matters as if more fully set forth herein.

120.    The Defendants' conduct alleged throughout this complaint was outrageous and exceeded society's bounds. It also violated the law and internal policies of the Multnomah County. The conduct by JCC Owens and John Does was reckless and intentional.

121.    Plaintiff and Plaintiff Estate suffered severe emotional distress throughout the supervision period. The Defendants' various actions described herein were the cause and source of the severe emotional distress.

122.    As a result of the actions by Defendants, Plaintiff and Plaintiff Estate incurred significant emotional losses which were treated with counseling and care. Plaintiff became severely depressed and was forced to take a leave from her employment. Plaintiff and Plaintiff Estate will seek their economic losses of no less than $150,000 and noneconomic damages to be determined at trial.

**SEVENTH CLAIM FOR RELIEF**: Negligence per se
City of Portland

123.    Plaintiff realleges all matters previously alleged herein as if more fully set forth.

124.    The Defendant owed a duty of care to Mr. Davis to provide standard-of-care emergency care, to call EMS, and to use Code 3 to create the urgency of the situation. Once the Defendants undertook to provide medical evaluation and render aid to Mr. Davis, they had the duty to comply with the law and their own policies in doing so. They were also bound by the minimum threshold of conduct mandated by the United States Constitution to protect life.

125.    Mr. Davis was a vulnerable person when Defendants encountered him. He had been shot and was unconscious. He could not speak for himself and in society would be the type

of person who is expected to receive the greatest level of care by police. Defendants had a duty to monitor his color and his breathing and to call EMS to the scene as quickly as possible through a Code 3 dispatch. Defendants had no authority or duty under law to take it upon themselves to ascertain his medical condition or to pronounce him dead at the scene.

126.    Because of the failures by City of Portland to follow the legal mandates and their own policies and to engage in conduct prohibited as official misconduct, it was reasonably foreseeable Mr. Davis would die because of the neglect and failures by Defendants. The delay and failures by Defendant City of Portland was the cause of Mr. Davis's death, extreme bleeding, and increased brain damage. The failure by the Portland Defendants to follow the law lost the opportunity for life held by Donté Davis.

127.    As a result of the violations of law, procedure, and policies by Portland Defendants, Mr. Davis suffered, bleed severely and died. His Estate incurred funeral expenses, hospital expenses, and the loss of future life. Mr. Davis is entitled to his economic and non-economic damages from the emotional harm the conduct by the Portland Defendants caused the Plaintiff and Plaintiff Estate.

### EIGHTH CLAIM FOR RELIEF: Negligence Special Relationship
City of Portland

128.    Plaintiff realleges all matters previously alleged herein.

129.    A special relationship existed between City of Portland and Decedent such that City of Portland owed the following duties:

      a.   To act in the best interests of Mr. Davis;

      b.   A duty to protect Mr. Davis from death and increased serious injury;

      c.   A duty to call EMS at the highest level of urgency and to transport Davis to the proper hospital for trauma care;

    d.   A duty to monitor Mr. Davis for signs of life including checking his breathing and likely his pulse;

    e.   A duty to provide timely and life-saving care to Mr. Davis; and

    f.   A duty to allow prejudice or bias interfere with the mandates under the law, rules, policies and Constitutional parameters.

130.    Mr. Davis was a vulnerable person as defined by Portland Police Bureau policies and by the nature of his medical state which included a brain injury, gunshot wound, bleeding, and an unconscious state. The Police were Mr. Davis's only hope of survival and they failed him.

131.    Defendants' failure in their mandated state law, internal policies, and Constitutional mandates cannot be ignored thus creating an unnecessary foreseeable risk of serious harm to Mr. Davis. This breach of their duties by Portland Police was the direct and proximate cause of Mr. Davis's death and unnecessary suffering as they allowed him to reach a dangerous point for recovery.

132.    As a result of the breach of its duty and Mr. Davis's foreseeable death, the Estate incurred economic damages to include funeral expenses and medical expenses in a number which will be subsequently included. Mr. Davis suffered severe emotional harm including fear, confusion, and isolation all to his non-economic damage.

WHEREFORE Plaintiff prays for a judgment as follows:

A.  Multnomah County and John Doe/Owens Defendants

    1.   A finding John Does and Defendant Owens violated Mr. Davis's protected Constitutional rights and as such the Estate is entitled to economic and non-economic damages;

2. A finding that John Doe Defendants and Defendant Owens violated Plaintiff's protected Constitutional right to a close familial relationship with her son causing her the loss of her son;

3. A finding that Multnomah County breached its duty to manage, supervise and protect Donté Davis which led to his death;

4. A finding that Multnomah County inflicted severe emotional harm on Plaintiff causing her to lose her relationship with her son and severe emotional losses;

5. Awarding a judgment against Defendants Multnomah County John Does and JCC Owens to include a sum for the economic and non-economic damages incurred by Plaintiffs; and

6. An award of Plaintiffs' reasonable attorney fees and such other equitable relief as is appropriate.

B. City of Portland and John Doe Portland Police Officers

1. A finding that John Doe Police Officers violated Mr. Davis's protected Constitutional rights and as such the Estate is entitled to economic and non-economic damages;

2. A finding that John Doe Defendants violated Plaintiff's protected Constitutional right to a close familial relationship with her son causing her the loss of her son;

3. A finding that Portland breached its duty under law to render aid and medical care, not to abandon Mr. Davis and caused Mr. Davis's death;

4. A finding that City of Portland breached a duty owed to Mr. Davis who was a vulnerable person and in breaching their duty caused his death all to the economic and non-economic loss of the Estate;

5. Awarding a judgment against Defendants Multnomah County John Does and JCC Owens to include a sum for the economic and non-economic damages incurred by Plaintiffs; and

6. An award of Plaintiffs' reasonable attorney fees and such other equitable relief as is appropriate.

Dated this 31st day of October 2024.

Respectfully submitted,


/s/Michelle R. Burrows
Michelle R. Burrows OSB861606
Attorney for Plaintiffs